# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re: RESOURCE TECHNOLOGY CORP., <br><br> Debtor. <br><br><br> LEON GREENBLATT, CHIPLEASE, INC., and BANCO PANAMERICA, INC., <br><br> Appellants, <br><br> v. <br><br> GREGG E. SZILAGYI, Chapter 11 Trustee for RESOURCE TECHNOLOGY CORP., <br><br> Appellee. | Case No. 04 C 4505 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

A bankruptcy judge approved an agreement between Chapter 11 debtor Resource Technology Group and creditors Aquila Energy Capital Corporation and Network Electric Corporation for the allocation of funds received by RTC. Several creditors opposed the agreement in the bankruptcy court and now appeal the bankruptcy court's approval of the agreement. For the reasons stated below, the Court affirms the bankruptcy court's decision.

1



## Standard of Review

This Court reviews the bankruptcy court's approval of a settlement agreement for abuse of discretion. *Depoister v. Mary M. Holloway Foundation*, 36 F.3d 582, 586-87 (7th Cir. 1994). The relevant inquiry is whether any reasonable jurist could agree with the bankruptcy court's decision. *In re Winer*, 162 B.R. 781, 783 (N.D. Ill. 1993). An abuse of discretion occurs if the bankruptcy judge based his decision upon an erroneous conclusion of law or if the record contains no evidence upon which on the decision rationally could have been based. *Id.*

## Factual Background

RTC is in the business of extracting methane gas pollution emitted from landfills and converting it into usable energy, which RTC sells to end users and utility companies. RTC has gas-to-energy conversion plants at many landfills. At issue in this case are the Taurus plant and the Titan plant, both located at the Pontiac Landfill.

The energy generated from the Pontiac Landfill is sold to Commonwealth Edison. Under Illinois law, RTC is entitled to sell energy to ComEd at a premium rate. On May 24, 2002, however, ComEd began compensating RTC at the lower, regular rate. RTC brought suit against ComEd, and extensive litigation ensued. RTC ultimately succeeded, and ComEd was ordered to pay RTC $2,968,803.93 for wrongful withholding of funds from the Pontiac Landfill. The allocation of these funds is the issue involved in the current dispute.

RTC filed a Chapter 11 petition on February 1, 2000. The bankruptcy court appointed a trustee, Gregg Szilagyi, on August 26, 2003. The trustee has focused his work on dealing with three of RTC's secured creditors: Aquila Energy Capital; Network Electric Corporation; and the Banco Group. Aquila has a first-position security interest in the Taurus Plant and the proceeds it

generates. NEC financed and constructed the gas-to-energy conversion system at the Pontiac Landfill. It holds a first-position security interest in the Titan Plant and the proceeds it generates. The Banco Group is a pre-petition and post-petition lender to RTC and holds a first-priority lien on most of RTC's assets, but not on the Pontiac Landfill. Banco's interest in receiving a share of the ComEd proceeds is subordinate to that of Aquila and NEC. The liens held by NEC and Aquila encumbered the ComEd proceeds, and thus the proceeds could not be disbursed until their security interests were resolved.

The trustee, Aquila, and NEC reached an agreement regarding the allocation of the ComEd funds and presented it to the bankruptcy court for approval on May 11, 2004. Pursuant to the agreement, $2,473,799.45 of the ComEd funds would go to Aquila and $495,004.23 would go to NEC. Of the funds going to Aquila, $723,799.75 would be allocated to pay certain RTC administrative expenses, to be used at the discretion of the trustee. Of the funds going to NEC, $45,094.23 would go to the payment of administrative expenses, but to be used only with NEC's approval. The division of funds was based on the proportion of production from the Taurus and Titan plants during the time period that ComEd should have been paying RTC the premium rate for energy purchased from those plants. In addition, the division of funds was based on the parties' shared belief shared that RTC had defaulted on its loans from Aquila and NEC. The loan agreements entitled the creditors, in the event of default, to accelerate their loans and demand the entire amount due.

Banco objected to the trustee's proposed settlement. Though Banco is not directly entitled to any of the ComEd proceeds, Tr. 50, it claims an interest in their allocation to pay RTC's operating expenses because it has a security interest in the net operating revenues of RTC.

3

Tr. 74. Chief Bankruptcy Judge Eugene Wedoff conducted a trial on May 25, 2004. He heard from five witnesses, including the trustee and John Connolly, RTC's current president. At the end of the trial, Judge Wedoff made an oral ruling granting the trustee's amended motion, thereby approving the settlement.[1] Banco is appealing the bankruptcy court's ruling.

## Discussion

When considering a settlement agreement, a bankruptcy judge is required to consider the settlement's terms in light of the probable costs and benefits of litigation. *In re American Reserve Corp.*, 841 F.2d 159, 161 (7th Cir. 1987). "Among the factors the bankruptcy judge should consider in his analysis are the litigation's probability of success, the litigation's complexity, and the litigation's attendant expense, inconvenience, and delay (including the possibility that disapproving the settlement will cause wasting of assets)." *Id.* Though the bankruptcy court may rely on the judgment of the trustee, he should not simply "rubber stamp" the trustee's proposal but rather must make an "informed an independent judgment." *Id.*

In this appeal, Banco argues that Judge Wedoff abused his discretion in approving the settlement because he did not adequately consider the relatively high probability of success and low cost of litigating of RTC's defenses against the disbursement of the ComEd proceeds to Aquila and NEC. Banco contends that RTC has a viable claim of entitlement to a greater share of the ComEd funds on several grounds: (1) Aquila's loan was not in default, and therefore Aquila is not entitled to accelerate the loan; (2) even if Aquila's loan is in default, the settlement agreement allocates too much of the proceeds to Aquila; and (3) NEC is not entitled to any of the

---

[1] Judge Wedoff did, however, change one aspect of the agreement. He ruled that the portion of the Aquila funds going to pay RTC's operating expenses ($723,799.75) could only be used with the Court's approval and not at the "unfettered discretion" of the trustee. Tr. 226.

4

ComEd proceeds because of construction problems with several plants it constructed. We will address each point in turn.

Under the credit agreement between Aquila and RTC, Aquila may declare the agreement to be in default upon the appointment of a bankruptcy trustee by written notice to RTC. In the event of default, Aquila has the right to demand payment of the loan to RTC without a reduction for unpaid operating expenses, and it is entitled to 100% of the profits generated by the Taurus Plant.[2] It is undisputed that Aquila gave RTC written notice of default soon after Szilagyi was appointed trustee. Despite this written notice, Banco asserts that Aquila did not properly declare that its loan was in default, for two reasons. First, it says that Aquila continued to perform as if no default had occurred even after sending written notice of default to RTC, by continuing to share profits from the Taurus plant as it had prior to the appointment and failing to demand full repayment of the loan. In fact, Banco says, Aquila did not begin to exercise its default rights until May 2004, only days before the settlement agreement was presented to the bankruptcy court. Second, Banco argues that Aquila actually supported the appointment of the bankruptcy trustee in bankruptcy court, thereby waiving its right to declare default based on the trustee's appointment.

Judge Wedoff considered Banco's waiver argument but did not accept it. Though Banco states that "Aquila - in open court - supported the appointment of the trustee," Appellants' Brief at 6-7, the transcript of the appointment proceeding reveals only that Aquila's attorneys were silent when Judge Wedoff asked if any party objected to the appointment of a trustee. *See*

---

[2]Absent a default, RTC and Aquila had a profit sharing plan under which RTC kept 20% of the profits generated by the Taurus plant.

Appellants' Reply, Appendix at 10. The fact that Aquila failed to object does not necessarily indicate that it actively supported the appointment. Furthermore, it is clear that on September 11, 2003, Aquila satisfied the provision of the loan agreement that requires that notice of default be provided in writing. It does not appear that the loan agreement required Aquila to exercise its default rights immediately upon written notification of default. Thus, although it is possible that a waiver argument could be made on RTC's behalf, the matter was, at a minimum, debatable, and Judge Wedoff's rejection of the argument certainly does not rise to the level of abuse of discretion.

Banco next asserts that even if Aquila properly declared its loan to RTC to be in default, the settlement agreement apportions too much of the ComEd proceeds to Aquila, because the proceeds were earned before September 11, 2003, the date default was declared.[3] Banco argues that Aquila's portion of the ComEd proceeds should be reduced by the operating expenses involved in generating the energy sold to ComEd during that period. The trustee responded to this assertion by explaining that even if RTC were entitled to more of the ComEd funds than the current agreement provides, RTC did not have the time or the funds time to litigate the issue. Szilagyi testified that it was in the best interest of RTC to settle the issue of the ComEd funds as soon as possible because RTC had immediate cash needs. RTC was under pressure to pay two engine operators that had issued notices of default and threatened to shut down operations. One party in particular, Solar Turbines, informed the trustee that it would shut down operations on May 31, 2004 unless it was paid. Tr. 32. Szilagyi testified that it was essential that Solar be paid

---

[3]ComEd improperly paid RTC the lower rate from July 2002 until September 2003. Tr. 48.

because RTC's plants could not function without the turbine engines. Tr. 33-34. Recognizing the debtor's immediate need for cash, Szilagyi approached NEC and Aquila as soon as the ComEd funds were released, and the parties engaged in negotiations continuously for over a week before reaching a settlement. Tr. 64. In the trustee's judgment, the agreement with Aquila was in the best interest of the estate, considering the looming May 31, 2004 deadline for paying Solar Turbines.[4]

In considering the settlement agreement, Judge Wedoff accepted the trustee's statement that he was "operating in a situation of very limited resources both in terms of time and money," Tr. 224, and therefore ruled that the trustee had come to a reasonable compromise with Aquila under the circumstances. This Court agrees. Contrary to Banco's argument, Judge Wedoff did consider the cost, time, and likelihood of success of litigation RTC's claim to Aquila's share of the ComEd proceeds. His analysis of the issues led him to conclude that "the trustee's exercise of judgment here is not an unreasonable one" and that the settlement is "one that is certainly within the range of litigation outcomes." Tr. 225. This Court finds nothing to suggest that this ruling was based upon an erroneous conclusion of law or a misreading of the evidence in the record. *See In re Winer*, 162 B.R. at 783 (an abuse of discretion occurs if the bankruptcy judge based his decision upon an erroneous conclusion of law or where the record contains no evidence upon which on the decision could rationally have been based). Though the agreement may not

---

[4]At trial, the trustee testified that:
Well, I suppose I could litigate with everybody about everything. But at this point I think the practical, you know, restrictions of this case are that I don't have the funds to litigate with the secured creditors in time to satisfy the cash needs of ths company ... I don't think I'm in a position to litigate with the secured lenders about the 506(c) issues before May 31st. Tr. 78.

7

provide the ideal allocation of funds from RTC's perspective, the bankruptcy court may "give weight to the trustee's informed judgment" in considering an agreement and need not "decide the numerous questions of law and fact raised by the parties." *In re Matters of Rimsat, Ltd.*, 224 B.R. 685, 688 (N.D. Ind. 1997) (internal citation omitted).

Banco's final basis for challenging the settlement agreement concerns NEC. NEC designed and built the gas-to-energy conversion systems at several RTC plants, including the plants at the Pontiac Landfill, the Congress Landfill, and the Beecher Landfill. The Congress and Beecher plants have been the subject of disputes between RTC and NEC due to construction problems. The current president of RTC, John Connolly, testified about those problems at length during the trial. Tr. 116-18. When asked whether NEC has tried to remedy the defaults, Mr. Connolly stated that NEC has "taken limited corrective action" and that there is still a long way to go before the defaults are completely remedied. Tr. 118. Connolly estimated that the combined cost of the consequences of the defaults and remedying them is approximately $55,000,000. Tr. 124.

Banco argues that NEC's share of the ComEd proceeds from the Pontiac Landfill should be offset by the cost of the defaults in its construction work at the Congress and Beecher Landfills. Banco bases this assertion on a setoff provision contained in the loan agreement between NEC and RTC, which states:

> 10.2 Additional Security; Right to Set-Off: Notwithstanding anything herein to the contrary, Borrower [RTC] shall also have the right to set-off and offset, on a dollar-for-dollar basis, any deposits or other sums at any time due from the Lender [NEC] to Borrower of any kind or description, pursuant to any agreement or other document, against the payment of the Loan and the Note.

If the setoff provision applied, NEC would not receive any of the ComEd funds, because the cost

8

of the defaults far outweighs its share of the funds. Judge Wedoff did not make a ruling as to the applicability of the setoff provision. Banco argues that Judge Wedoff should not have approved the settlement because the applicability of the setoff provision is a question of law that could be decided quickly and inexpensively.

NEC and the trustee argue that the issue is far more complicated than Banco suggests. Though Banco casts the issue as one of law, it ignores the fact that the alleged construction defaults have not yet been established. Determining what defaults occurred, when they occurred, and whether they have been rectified are all *fact* determinations that would require lengthy discovery and litigation. Furthermore, the applicability of the setoff provision is not quite as simple as Banco contends. NEC argues that the provision should not apply to the ComEd funds because the Congress and Beecher facilities had no role in procuring those funds. In the trustee's judgment, this is a persuasive argument that creates a significant risk that RTC would undertake costly litigation and be left with nothing. Under the current agreement, RTC at least retains $45,094.23 of the ComEd proceeds which it can use to pay Solar Turbines, thereby avoiding a potential shutdown in operations.

Though Judge Wedoff did not rule on the applicability of the setoff provision to the ComEd proceeds, he emphasized that the current settlement agreement did not require RTC to relinquish its right to litigate the construction problems with NEC at a later date. Tr. 208. Banco argues that the bankruptcy court's failure to rule on setoff provision issue was an abuse of discretion. Besides its contention that the applicability issue is a question of law that could be decided speedily and inexpensively, Banco contends the issue will most likely have to be litigated at some point in the future, requiring RTC to incur expenses later.

9

Though Banco's arguments against allocating the ComEd funds to NEC have arguable merit, Judge Wedoff disagreed with Banco's analysis of the NEC construction problems. It is clear from the record that Judge Wedoff carefully considered Banco's arguments and decided that the risk and time involved in litigating the NEC claims outweighed any shortcomings of the settlement agreement. He stated that the damage calculation of $55,000,000 was "very rough" and unreliable and that RTC's probability of success in litigating the set-off provision was a "very open question." Tr. 225.[5]

After considering all of Banco's arguments in opposition to approval of the settlement agreement, Judge Wedoff concluded that without the agreement, "the ability of the trustee to use any of the funds in question is highly debatable one" and thus the benefits of the agreement outweighed the risk, cost, and time involved in litigating RTC's defenses. Tr. 222. This decision was based on an independent judgment regarding the appropriate factors and this was not an abuse of discretion.

## Conclusion

The clerk is directed to enter judgment affirming the decision of the bankruptcy court.

MATTHEW F. KENNELLY
United States District Judge

Date: 10 January 2005

---

[5] Judge Wedoff stated that, "beyond the question of the trustee's right to seek the funds and to obtain the funds for the benefit of the estate, the question of whether the trustee could assert causes of action against NEC for improper installation of its engines in Beecher and in Congress is one that appears to be a very open question." Tr. 224-25.

10